UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

RONALD DAVIS #223815,

        Plaintiff,

v.

MICHIGAN DEPARTMENT OF
CORRECTIONS, DUNCAN
MacLAREN, CHRISTOPHER
MORTENSEN, and DONALD
MANSFIELD,

        Defendants.
_____/

Case No. 2:18-cv-6

Hon. Paul L. Maloney
U.S. District Judge

## REPORT AND RECOMMENDATION

### Introduction

This is a civil rights action brought by state prisoner Ronald Davis pursuant to 42 U.S.C. § 1983. In his complaint, Davis alleges that while he was detained at Kinross Correctional Facility (KCF) in Kincheloe, Michigan, Defendants Duncan MacLaren, Christopher Mortenson, and Donald Mansfield: (1) deprived him of his First Amendment right to freely exercise his religion, (2) deprived him of his right to freely exercise his religion under the Religious Land Use and Institutionalized Persons Act (RLUIPA), and (3) failed to protect him from serious harm, in violation of the Eighth Amendment.

This Report and Recommendation addresses both Davis's and Defendants' motion for summary judgment as to the above claims. Based on a review of the

relevant documents, the undersigned concludes (1) that Davis has failed to exhaust his Eighth Amendment deliberate indifference claim, (2) that there exists no genuine issue of material fact as to Davis's First Amendment free exercise claim, and (3) that Davis's RLUIPA claim is moot because he has moved to a different prison. Thus, the undersigned respectfully recommends that this Court (1) deny Davis's motion for summary judgment, (2) grant Defendants' motion for summary judgment in part, and (3) dismiss Davis's RLUIPA claim as moot. Acceptance of this Report and Recommendation will result in the dismissal of the case.

## Procedural History

Davis filed his initial complaint on January 19, 2018. (ECF No. 1.) On May 11, 2018, U.S. District Judge Paul L. Maloney issued an opinion and order dismissing the Michigan Department of Corrections from the case based on Eleventh Amendment immunity. (ECF Nos. 6, 7.) On November 6, 2018, Davis filed a motion for summary judgment and an accompanying brief. (ECF Nos. 20, 21.) On December 28, 2018, Defendants filed a motion for summary judgment and an accompanying brief. (ECF Nos. 32, 33.) Davis filed a response to Defendants' motion for summary judgment on January 10, 2019 and a supplement to his response on January 22, 2019. (ECF Nos. 37, 38.)

## Factual Allegations

Davis is a Sunni Muslim and is required to perform five daily Salats, or ritual prayers. (ECF No. 1, PageID.3-4.) When performing these Salats, Davis must face Makkah [Mecca] and variously stand, bow, and prostrate himself while reciting

certain prayers. (*Id*. at PageID.6-7.) According to Davis, there is not enough room in his eight-man cubicle to perform his daily Salats, causing him to frequently invade the space of other prisoners assigned to his cubicle. (*Id*. at PageID.9.) Consequently, Davis has been repeatedly threatened, abused, and physically assaulted by other prisoners while trying to perform the Salats. (*Id*. at PageID.10.) Davis states that he is unable to ward off attacks or to defend himself because of his deteriorating health. (*Id*.)

Davis says that, on August 15, 2017, he spoke to the Warden – Defendant MacLaren – and informed MacLaren of his inability to perform Salats in his cubicle. (*Id*. at PageID.11.) Davis explained that even while standing in front of his own bunk, performing the Salat forced him to infringe on his roommates' space, causing tension. (*Id*.) Davis further explained that the other prisoners in his cubicle constantly interrupt his Salats when they bump him, step over him, or force him to stop praying to move out of the way. (*Id*.) Davis says that Defendant MacLaren told him that he (MacLaren) was not going to address Davis's concerns because they were religious in nature, and therefore did not concern him. (*Id*. at PageID.12.)

Davis also says that, on August 16, 2017, he spoke to his Prison Counselor – Defendant Mortensen – and informed Mortensen of his inability to perform his Salats within his cubicle. (*Id*. at PageID.14.) Davis asked to be moved, or for permission to make his Salat in an alternate location in the housing unit. (*Id*. at PageID.15.) Defendant Mortensen told Davis that he would investigate the matter and find out what could be done. (*Id*.) On August 21, 2017, Defendant Mortensen told Davis that

3

he had spoken with the Resident Unit Manager – Defendant Mansfield – and that they both agreed that Davis's inability to make his daily prayers was "not a valid problem." (*Id*.) Defendant Mortensen told Davis that if he wanted to pray, he should do it on his bunk. (*Id*.) When Davis explained that he could not do a proper Salat on his bunk, Defendant Mortensen told Plaintiff to either work it out with his roommates or to change his religion. (*Id*. at PageID.15.)

### Summary Judgment Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Kocak v. Comty. Health Partners of Ohio, Inc.*, 400 F.3d 466, 468 (6th Cir. 2005). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*, 421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 296 (6th Cir. 2005). [1]

---

[1] Davis argues in both his response and supplemental response that Defendants violated W.D. Mich. LCivR. 7.1(b), which provides: "[w]hen allegations of facts not appearing in the record are relied upon in support of or in opposition to any motion, all affidavits or other documents relied upon to establish such facts shall accompany the motion." Davis contends that because Defendants relied on affidavits that were

4

**Eighth Amendment Failure to Protect**

The Eighth Amendment requires that prison officials "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To establish an Eighth Amendment claim against prison officials based on their failure to protect the plaintiff from attack by other inmates, a plaintiff must present evidence showing that the defendants' conduct amounted to "deliberate indifference" to a known risk of harm. *Farmer*, 511 U.S. at 837. *See also Woods v. Lecureux*, 110 F.3d 1215, 1222 (6th Cir. 1997). Deliberate indifference includes both objective and subjective elements. *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011); *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001). The objective element requires the harm to be "sufficiently serious." *Id.* (quoting *Farmer*, 511 U.S. at 834). Therefore, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm." *Id.* The subjective element focuses on whether prison officials "had a sufficiently culpable state of mind." *Id.* This requires that prison officials know that inmates face a substantial risk of harm and "disregard[ ] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. Prison officials must exhibit more than lack of due care for a prisoner's safety before an Eighth

---

not included with their original brief and were instead filed a week later, Defendants' motion for summary judgment should be dismissed or the affidavits should not be considered in responding to the motion. (ECF No. 37, PageID.358.) After reviewing the record, the undersigned declines to take such a strict approach. Although Defendants failed to attach the affidavits when they first filed their motion, Davis was still aware of some of the statements because Defendants directly quoted them in their brief. More importantly, after Defendants filed the affidavits, Davis had the opportunity to respond in his supplemental brief.

Amendment violation will be found. *Id.* at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. It is not enough that the official "should" have perceived a significant risk, but did not. *Id.*

Davis devotes some ten pages of his brief to arguing that he is entitled to summary judgment on his Eighth Amendment claim. (*See* ECF No. 21, at PageID.77-86.) The undersigned has not considered this aspect of Davis's brief because the undersigned has concluded that Davis has failed to exhaust his administrative remedies as to his Eighth Amendment, thus entitling Defendants to summary judgment on this issue. (*See* ECF No. 33, PageID.239 (Defendants' claim that Davis has failed to exhaust his administrative remedies).)

A prisoner's failure to exhaust his administrative remedies is an affirmative defense, which Defendants have the burden to plead and prove. *Jones v. Bock*, 549 U.S. 199, 212-16 (2007). "[W]here the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). Accordingly, summary judgment in favor of the party with the burden of persuasion "is

6

inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

Pursuant to the applicable portion of the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e(a), a prisoner bringing an action with respect to prison conditions under 42 U.S.C. § 1983 must exhaust his available administrative remedies. *Porter v. Nussle*, 534 U.S. 516, 532 (2002); *Booth v. Churner*, 532 U.S. 731, 733 (2001). A prisoner must first exhaust available administrative remedies, even if the prisoner may not be able to obtain the specific type of relief he seeks in the state administrative process. *Porter*, 534 U.S. at 520; *Booth*, 532 U.S. at 741; *Knuckles El v. Toombs*, 215 F.3d 640, 642 (6th Cir. 2000); *Freeman v. Francis*, 196 F.3d 641, 643 (6th Cir. 1999). In order to properly exhaust administrative remedies, prisoners must complete the administrative review process in accordance with the deadlines and other applicable procedural rules. *Jones*, 549 U.S. at 218-19; *Woodford v. Ngo*, 548 U.S. 81, 90-91 (2006). "Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.'" *Jones*, 549 U.S. at 218-19. In rare circumstances, the grievance process will be considered unavailable where officers are unable or consistently unwilling to provide relief, where the exhaustion procedures may provide relief, but no ordinary prisoner can navigate it, or "where prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Ross v. Blake*, 578 U.S. ___, 136 S.Ct. 1850, 1859-60 (2016).

"Beyond doubt, Congress enacted [Section] 1997e(a) to reduce the quantity and improve the quality of prisoner suits." *Porter*, 534 U.S. at 524. In the Court's view, this objective was achieved in three ways. First, the exhaustion requirement "afforded corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Id.* at 525. Second, "the internal review might 'filter out some frivolous claims.'" *Id.* (quoting *Booth*, 532 U.S. at 737*).* And third, "adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." *Id*. When institutions are provided adequate notice as required under the PLRA, the opportunity to address the claims internally furthers the additional goals of limiting judicial interference with prison administration. *Baker v. Vanderark*, No. 1:07-cv-004, 2007 WL 3244075, at *5 (W.D. Mich. Nov. 1, 2007).

Michigan Dept. of Corrections (MDOC) Policy Directive 03.02.130 (eff. date 07/09/07, superseded on 03/18/19), sets forth the applicable grievance procedures for prisoners in MDOC custody at the time relevant to this complaint. Inmates must first attempt to resolve a problem orally within two business days of becoming aware of the grievable issue, unless prevented by circumstances beyond his or her control. *Id*. at ¶ P. If oral resolution is unsuccessful, the inmate may proceed to Step I of the grievance process and submit a completed grievance form within five business days of the attempted oral resolution. *Id*. at ¶¶ P, V. The inmate submits the grievance to a designated grievance coordinator, who assigns it to a respondent. *Id*. at ¶ V. The Policy Directive also provides the following directions for completing grievance forms:

8

"The issues should be stated briefly but concisely. Information provided is to be limited to the <u>facts</u> involving the issue being grieved (i.e., who, what, when, where, why, how). Dates, times, places and names of all those involved in the issue being grieved are to be included." *Id.* at ¶ R (emphasis in original).

If the inmate is dissatisfied with the Step I response, or does not receive a timely response, he may appeal to Step II by obtaining an appeal form within ten business days of the response, or if no response was received, within ten days after the response was due. MDOC Policy Directive 03.02.130 at ¶¶ T, BB. The respondent at Step II is designated by the policy, *e.g.,* the regional health administrator for medical care grievances. *Id.* at ¶ DD.

If the inmate is still dissatisfied with the Step II response, or does not receive a timely Step II response, he may appeal to Step III using the same appeal form. *Id.* at ¶¶ T, FF. The Step III form shall be sent within ten business days after receiving the Step II response, or if no Step II response was received, within ten business days after the date the Step II response was due. *Id.* at ¶¶ T, FF. The Grievance and Appeals Section is the respondent for Step III grievances on behalf of the MDOC director. *Id.* at ¶ GG. "The total grievance process from the point of filing a Step I grievance to providing a Step III response shall generally be completed within 120 calendar days unless an extension has been approved." *Id.* at ¶ S.

The only grievance identified as relevant by either party is grievance <u>#KCF-17-08-0706-20z</u>. While the grievance proceeded through all steps of the grievance process, Defendants argue that the content of this grievance was insufficient to

9

provide prison officials with notice of a failure to protect claim. (ECF No. 33, PageID.242.) In his response, Davis argues that the grievance was detailed enough to put Defendants on notice of the violation of his Eighth Amendment rights. (ECF No. 37, PageID.356.) The portion of grievance #KCF-17-08-0706-20z, in which Davis states the issue that he is grieving, is attached below.

> I am filing this grievance against the MDOC, KCF Warden MacLaren, KCF RUM Mansfield, KCF PC Mortensen, and all other parties involved that are unknown to me at this time because of lack of knowledge, for infringing upon my Constitutionally protected rights under the 1st, 5th, 8th, 14th, and RLUIPA. The above named parties are denying me the right to practice my religion. For example, I am being denied the right to worship my Lord in compliance with my religious obligatory practices of making prayer. As a devout Muslim I am obligated through my sincerely held belief that I am mandated to make five (5) prayers daily at a prescribed time in a prescribed manner. And because I am being forced to live in an eight man cube setting at this facility there is no place for me to be able to make five (5) obligatory daily prayers without creating conflict between other prisoners and myself because of the lack of space. At all times I am either in the way of others going in and out of their personal space, i.e., their lockers and/or getting on/off their bunks or they are in mine interfering with my ability to pray. This setting is creating a substantial burden on my ability to practice/perform my sincerely held religious beliefs and is greatly diminishing my spiritual experience between my Lord and myself.
>
> On August 15, 2017, I personally spoke with Warden MacLaren and asked him for help with the above stated problems that I was facing in great detail and he told me that he was not going to address my issues because they are religious in nature and that was not his concern at this point and that I should take it up with my PC. So, on August 16, 2017, I spoke to PC Mortensen about the above issues in great detail and asked him for help. I even suggested that maybe I could make my prayers at the end of the hallway because this is what was allowed at LCF. PC Mortensen responded by telling me that he would investigate and find out what can be done and that I should check back with him in a few days.
>
> On August 21, 2017, I went back to PC Mortensen and asked him what resolution has the administration come up with concerning my issues with being able to pray? PC Mortensen informed me that he spoke with RUM Mansfield about my problem and that they both agree that a prisoner not being able to make prayer is not a valid problem because it does not violate the MDOC Policy Directive PD 05.03.150(B), which he quoted to me. He then told me that if I wanted to make prayer in the cube then I should do it on my bunk. I once again explained to PC Mortensen that as a Muslim it is mandatory for me to pray in a certain manner that was prescribed by the Prophet Muhammad (PBUH) and that manner could not be performed on my bunk as he suggested  PC Mortensen responded to what I told him by saying that, "If you want to make prayer in your cube then you need to work that out with your cubies the best way you can or change your religion!"
>
> If the administration is going to force me to handle this matter on my own accord then I am going to be forced to follow what the Prophet Muhammad (PBUH) has instructed us to do in this type of situation. The Prophet (PBUH) said: "When one of you prays behind anything which screens him from the people, then if someone wants to pass between him and the Sutrah, he should repel him by pushing at his chest. And if he refuses to defer then fight him for he is a devil." (Bukhari and Muslim).

10

> I am trying my hardest to resolve this problem in a peaceful manner, but the administration continues to refuse to step in and address this issue with a proper resolution that will allow all parties the rights they are entitled to as prisoners. By refusing to address this serious issue the administration, i.e., the MDOC, MacLaren, Mansfield, Mortensen, and the unknown others involved are creating an extremely hostile environment for me to live in as a practicing Muslim who simply wants to pray to his Lord the way he has been commanded to do. This is without doubt cruel and unusual punishment that goes beyond the scope of my imprisonment.
>
> RESOLUTION
>
> Provide me with a designated area to pray my five (5) daily obligatory prayers in which will also allow other prisoners to be able to have access to their personal areas and property without infringing upon my ability to properly perform my obligatory prayers.
>
> *Ronald Davis*

(ECF No. 33-4, PageID.288-289.)

In the first paragraph of his Step I grievance, Davis alleges a violation of his rights under the First, Fifth, Eighth and Fourteenth Amendments. He makes no other mention of a possible Eighth Amendment violation until the fifth paragraph, where he states that he is living in a hostile environment. He concludes this paragraph by claiming that he has been subjected to cruel and unusual punishment. But a reasonable interpretation of this paragraph is that he is saying that his inability to pray constitutes cruel and unusual punishment. Nothing in the Step I grievance amounts to a claim that prison officials were violating his rights by being deliberately indifferent to a substantial risk of serious harm. Indeed, Davis does not mention that he is being harassed or physically assaulted by any other inmates. Nor does he describe any specific events that would alert prison officials to the fact that other prisoners were threatening him. In his Step I grievance, Davis simply claims that is that he does not have adequate space to perform his daily prayers. That is the

11

gravamen of his claim. He failed to articulate an Eighth Amendment violation in his Step I grievance.

A review of his Step II and III confirms this interpretation. At Steps II and III, Davis dropped any mention of a hostile environment and simply asserts that prison officials are incorrect in stating that he has adequate room to pray in his living area. (ECF No. 33-4, PageID.284.)

Davis's assertions in Step I of the grievance process did not provide prison officials with adequate notice of a potential Eighth Amendment violation based on Defendants' failure to protect Davis from serious harm. And even if Davis's assertions at Step I were sufficient, he failed to challenge the prison's response to his Eighth Amendment claim at Steps II and III. Thus, the undersigned concludes that Davis has failed to exhaust his administrative remedies with regard to his Eighth Amendment deliberate indifference claim. Accordingly, the undersigned respectfully recommends that the Court grant Defendants' motion for summary judgment regarding Davis's Eighth Amendment claim.[2]

---

[2]  The undersigned further notes that even if Davis exhausted his administrative remedies, he likely fails to state a claim under the Eighth Amendment because he has not suffered any actual injury. *See Seabrooks v. Core Civic*, 2019 WL 1015093, at *4 (M.D. Tenn. Mar. 4, 2019) (discussing the failure to protect standard and determining "Plaintiff's lack of an allegation of any physical injury arising from Defendants' alleged conduct is fatal to his claim for damages in light of Section 1997e(e).").

**First Amendment Religious Exercise**

While "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights," inmates clearly retain the First Amendment protection to freely exercise their religion. *O'Lone v. Shabazz*, 482 U.S. 342, 348 (1987) (citations omitted). To establish that this right has been violated, Plaintiff must establish: (1) that the belief or practice he seeks to protect is religious within his own "scheme of things," (2) that his belief is sincerely held, and (3) that Defendant's behavior infringes upon this practice or belief. *Kent v. Johnson*, 821 F.2d 1220, 1224-25 (6th Cir. 1987); *see also, Flagner v. Wilkinson*, 241 F.3d 475, 481 (6th Cir. 2001) (same); *Bakr v. Johnson*, No. 95-2348, 1997 WL 428903, at *2 (6th Cir. July 30, 1997) (noting that "sincerely held religious beliefs require accommodation by prison officials").

Davis makes it clear in his complaint that he is a devout Sunni Muslim who sincerely believes that he is obligated to establish Salat in observance of his religion. (ECF No. 1, PageID.4.) Further, Davis has demonstrated a sincere belief in the necessity of complying with the elements of Salat including, among others, the need to face Mecca and to perform various movements during prayer. (ECF No. 1, PageID.7.) In addition, several of the exhibits attached to Davis's brief in support of his motion are affidavits from the other prisoners who were housed in his cubicle at the time, all of which support Davis's claim that by requiring Davis to perform his prayers in his cubicle, Defendants infringed upon Davis's ability to adequately perform these prayers. (ECF Nos. 21-1, 21-2, 21-3.)

In his affidavit, prisoner Guy R. Lendrum states that, "there has [sic] been several times in which I have been trapped on my bunk and I had to use the restroom therefore I had to interfere with [Davis's] prayer." (ECF No. 21-1, PageID.96.) In prisoner Jimmie Smiley's affidavit, he states, "[t]he problem with [Davis] praying in the cubicle is that when he did it he would be blocking me and the inmates on bunk 2-57 and 2-60 from being able to get and/or off of our assigned bunks or from being able to have access to our storage lockers." (ECF No. 21-2, PageID.98.) Finally, in prisoner Dennis Klan's affidavit, he states, "[i]t [sic] is just not enough space in our cubicle for him to be able to make his prayers the way he does, because while he is praying he always completely stops all movement on one-half of the cubicle... it has created a very hostile living environment . . . ." (ECF No. 21-3, PageID.100.)

The undersigned recommends that the above statements within the affidavits of those sharing Davis's cubicle in addition to the allegations made by Davis in his complaint are sufficient to establish that Defendants' behavior did infringe upon Davis's exercise of his religion to some degree. However, prison officials may impinge on these rights where their actions are "reasonably related to legitimate penological interests." *See Flagner*, 241 F.3d at 483 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess the official's actions by reference to the following factors:

1. does there exist a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;

2. are there alternative means of exercising the right that remain open to prison inmates;

3. the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and

4. whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests.

*Flagner*, 241 F.3d at 484 (quoting *Turner*, 482 U.S. at 89-91).

In their brief, Defendants first argue that there is a legitimate penological interest behind requiring Davis to perform his daily prayers in his cubicle. (ECF No. 33, PageID.246 (citing MacLaren's affidavit at ¶ 12).) According to Defendants, increased prisoner movement within the facility is a safety and security concern for both prisoners and staff at KCF. (*Id.*) While accommodating the needs of one prisoner may not seem likely to endanger those within the prison or to be unduly burdensome on the prison officials, there are more than seventy other Muslim prisoners at KCF, and making these accommodations for individual prayer five times a day for each prisoner would have a significant impact on prisoner movement. (*Id.*)

Regarding alternate means of exercise, Defendants aver that in addition to developing a prayer schedule with the prisoners in his cubicle, KCF offers Muslim

15

group services that Davis is free to attend. (ECF No. 33, PageID.247.) According to Defendants, provision of accommodations beyond these options would result in undue strain on the MDOC resources. (*Id*.) Because MDOC policy requires that prison staff search the areas in which religious groups gather and provide random in-room staff supervision at the very minimum, providing separate space for Muslim inmates to gather five times a day would be strenuous to MDOC resources. (ECF No. 33-7, PageID.302.) Finally, Defendants argue Davis has not provided a readily available alternative that fully accommodates Davis's rights at *de minimis* cost to the Defendants' valid penological interests. Defendants claim that they already provide prisoners with readily available alternatives by allowing him to receive religious literature unique to Muslim beliefs, receive clergy visits, and possess personal religious property in addition to allowing him to pray within his area of control. (ECF No. 33, PageID.248.)

In his complaint, Davis claims that he "requested that he be moved to another cubicle or that he be allowed to make his obligatory daily Salat in the unit quiet room, the TV room, at the end of the hallway, and/or in the lobby next to the unit officers' desk. . . ." (ECF No. 1, PageID.15.) In addition, Davis provided two affidavits from other Muslim prisoners, one alleging that he was moved to a different unit so that he could perform his daily prayers, and another claiming that he was allowed to perform his prayers at the end of the hallway in his housing unit. (ECF Nos. 21-14, 21-15.) While these documents seem to suggest readily available alternatives, Defendant MacLaren explained in his affidavit that the prison staff in charge of the unit in which

16

the prisoner was praying in hallway were unaware of the practice and the other prisoner was not moved for the sole purpose of performing his daily Salat. (ECF No. 35-1, PageID.321.)  The fact that other prisoners are engaging in unauthorized practices does not indicate a readily available alternative.

Because the undersigned agrees that the safety and security concerns associated with increased movement are valid penological interests for requiring prisoners to perform their prayers in their designated area of control, and because Davis has failed to establish an issue of material fact regarding this factor, the undersigned recommends that the Court grant Defendants' motion for summary judgment with regard to Davis's First Amendment claim.

**Religious Land Use and Institutionalized Persons Act (RLUIPA)**

RLUIPA applies to prisons that receive federal funds, and prohibits state and local governments from placing "a substantial burden" on the "religious exercise" of any inmate unless they establish that the burden furthers a "compelling governmental interest" and does so in the "least restrictive" way. 42 U.S.C. § 2000cc–1(a).  Although the statute permits the recovery of "appropriate relief against a government," 42 U.S.C. § 2000cc-2(a), monetary damages are not available under RLUIPA.  In *Sossamon v. Texas*, 563 U.S. 277, 293 (2011), the Supreme Court held that the RLUIPA did not abrogate sovereign immunity under the Eleventh Amendment.  *See also Cardinal v. Metrish*, 564 F.3d 794, 801 (6th Cir. 2009) ("[T]he Eleventh Amendment bars plaintiff's claim for monetary relief under RLUIPA.").

Because monetary damages are not available under RLUIPA, the only available remedy is that of injunctive relief. However, Davis was transferred to Ionia Correctional facility on February 14, 2019 (ECF No. 39), rendering his request for injunctive relief moot pursuant to *Kensu v. Haigh*, 87 F.3d 172, 175 (6th Cir. 1996). Because relief can no longer be granted, the undersigned recommends that Davis's RLUIPA claim be dismissed as moot.

## Qualified Immunity

Defendant moves for dismissal based upon qualified immunity. Government officials, performing discretionary functions, generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Dietrich v. Burrows*, 167 F.3d 1007, 1012 (6th Cir. 1999); *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997); *Noble v. Schmitt*, 87 F.3d 157, 160 (6th Cir. 1996); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). An "objective reasonableness" test is used to determine whether the official could reasonably have believed his conduct was lawful. *Dietrich*, 167 F.3d at 1012; *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). "Qualified immunity balances two important interests-the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

In making a qualified immunity determination the court must decide whether the facts as alleged or shown make out a constitutional violation or whether the right

that was allegedly violated was a clearly established right at the time of the alleged misconduct. *Id.* at 232-33. If the court can conclude that either no constitutional violation occurred or that the right was not clearly established, qualified immunity is warranted. The court may consider either approach without regard to sequence. *Id.*

Because the undersigned finds that Defendants did not violate Davis's First Amendment rights, the undersigned concludes that Defendants are entitled to qualified immunity on the First Amendment claim.[3]

### Recommendation

The undersigned respectfully recommends that the Court: (1) deny Davis's motion for summary judgment as to all claims, (2) grant Defendants' motion for summary judgment as to Davis's Eighth Amendment claim because Davis failed to exhaust his administrative remedies, (3) grant Defendants' motion for summary judgment as to Davis's First Amendment claim based on the legitimate penological interests of the MDOC in requiring prisoners to pray in their area of control, and (4) dismiss Davis's RLUIPA claim because he has been transferred and his claim is now moot. Acceptance of this report and recommendation will result in the dismissal of this case.

---

[3] Although the undersigned finds that Davis failed to exhaust his administrative remedies on the Eighth Amendment claim and that the RLUIPA claim is moot, those findings do not have any bearing on whether Defendants are entitled to qualified immunity on those claims. In addition, because the undersigned already recommends dismissal of those claims, the undersigned need not determine whether Defendants are entitled to qualified immunity on the Eighth Amendment and RLUIPA claims.

NOTICE TO PARTIES: Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).

Dated:  August 12, 2019                           /s/ *Maarten Vermaat*
                                                  MAARTEN VERMAAT
                                                  U. S. MAGISTRATE JUDGE